# United States Tax Court

T.C. Memo. 2024-65

IAN D. SMITH,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 25605-15W.                    Filed June 4, 2024.

————

When P filed a claim for an award regarding T's unpaid taxes, R had already selected, for income tax examination, the consolidated group of which T was a member. However, the examination had not yet been initiated. P's claim asserted that T received gift certificates from its customers in payment for T's services. P's claim further asserted that T did not report the gift certificates as income and that T transferred the gift certificates to its employees as compensation without reporting the compensation as wages or paying employment tax on the compensation.

Once an income tax examination was initiated, the exam team used P's information. The exam team determined to disallow deductions for portions of amounts that were recorded in five categories of T's general ledger accounts and deducted on the consolidated returns. The exam team also disallowed deductions as part of five other adjustments that were unrelated to P's information.

A concurrent employment tax examination for T and two related companies was conducted. The employment tax examiner determined that employment taxes had not been paid with respect to portions of amounts recorded in the same five categories of general ledger accounts. The

[*2] employment tax examiner also determined that employment taxes had not been paid on portions of amounts recorded in a sixth general ledger account. This last adjustment was unrelated to P's information.

The IRS's Whistleblower Office (WBO) concluded that the amounts in dispute within the meaning of I.R.C. § 7623(b)(5) include only amounts attributable to whistleblower information. Employing this legal conclusion, the WBO determined that the amounts "in dispute" with respect to P's claim did not exceed $2 million. Therefore, the WBO made an award to P under I.R.C. § 7623(a) rather than I.R.C. § 7623(b).

P filed a Petition contesting this award. We issued an Opinion holding that the amounts "in dispute" under I.R.C. § 7623(b)(5)(B) are not limited to whistleblower information and that the amounts in dispute with respect to P's claim exceeded $2 million. *Smith v. Commissioner*, 148 T.C. 449, 460, 462–63 (2017). We remanded the case for the WBO to conduct an additional investigation and to determine an award under I.R.C. § 7623(b).

On remand, the WBO determined to award P 15% of the proceeds of the income tax and employment tax examinations that were related to P's information. In the WBO's view, the proceeds related to P's information included only the proceeds from the adjustments related to the five general ledger accounts. R filed a Motion for Summary Judgment.

*Held*: We will grant R's Motion.

————————

*Thomas C. Pliske*, for petitioner.

*Jadie T. Woods*, *Patricia P. Davis*, and *George E. Heuring, Jr.*, for respondent.

[*3]                              CONTENTS

MEMORANDUM OPINION ................................................................. 3

*Background* ...................................................................................... 6

I.    Petitioner's claim submission .......................................... 6

II.   Transmission of claim to LMSB Exam ........................... 8

        A.    Income tax examination ....................................... 10

        B.    Employment tax examination ............................... 15

III.  WBO's original 2015 decision under section 7623(a) .................... 22

IV.   Tax Court Opinion and remand ..................................... 26

V.    WBO's Supplemental Determination Under Section 7623(b) ...... 27

*Discussion* ...................................................................................... 31

I.    The WBO did not err in determining that the amount to be
      multiplied by the award percentage was the sum of
      $1,772,040.53 and $1,720,582.33. ................................... 31

II.   The WBO did not err in determining that the appropriate
      award percentage was 15%. ........................................... 34

III.  The WBO did not err in determining that petitioner's
      whistleblower award is subject to the sequestration
      percentage in effect for the fiscal year that the award is
      paid........................................................................................ 47

IV.   Conclusion............................................................................. 48

## MEMORANDUM OPINION

MORRISON, *Judge*: In 2008 petitioner submitted information to the Internal Revenue Service (IRS) Whistleblower Office (WBO)

**[*4]** regarding TAXPAYER1.[1]  The IRS used petitioner's information in part of an income tax examination of the consolidated group of which TAXPAYER1 was a member.  The IRS also used petitioner's information in part of an employment tax examination for TAXPAYER1 and related entities, TAXPAYER2 and TAXPAYER3.  The statutory provisions governing payments of awards to whistleblowers are section 7623(a),[2] which gives the IRS discretionary authority to make awards, and section 7623(b), which requires the IRS to make awards if, among other things, the "tax, penalties, interest, additions to tax, and additional amounts in dispute exceed $2,000,000."  Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, div. A, § 406(a)(1)(D), 120 Stat. 2922, 2958–59.  The income tax examination resulted in adjustments related to five general ledger accounts (i.e., (1) Local Barter Usage, (2) Employee relations—nonsales, (3) Employee relations—sales, (4) Sales meetings/rallies, and (5) Rec Sales).  The income tax examination also resulted in five other adjustments (i.e., (1) stock-option expense, (2) interest expense, (3) amortization of goodwill, (4) inventory capitalization, and (5) bonus accruals).  The increased liability resulting from the income tax examination was $14,543,098, an amount that was calculated without interest and penalties.[3]  The increased liability resulting from the income tax examination that was attributable to the five general ledger accounts was $1,720,582.33.  This amount included penalties and interest.[4]  The increased liability resulting from the employment tax examination was $3,853,345.45, calculated as follows:

---

[1] Words in all capital letters, the meaning of which is not otherwise specified in this Opinion, are identifiers for redacted information.  These identifiers, and the items of redacted information to which they correspond, are found in reference lists filed by the parties as document Nos. 3 and 98.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[3] This amount is discussed in note 19.

[4] This amount is discussed in note 30.

| [*5] | Local Barter Usage general ledger account | Four other general ledger accounts[5] | Subtotal | Chairman's Club | Total |
|---|---|---|---|---|---|
| Tax | $496,095 | $926,897.82 | $1,422,992.82 | $1,671,195.31 | $3,094,188.13 |
| Penalties | 99,219 | 185,379.56 | 284,598.56 | 334,239.07 | 618,837.63 |
| Subtotal | 595,314 | 1,112,277.38[6] | 1,707,591.38 | 2,005,434.38 | 3,713,025.76 |
| Interest (A)[7] | | | 64,320.39 | 75,999.30 | 140,319.69 |
| Interest (B)[8] | | | 64,449.15 | 76,157.95 | 140,607.10 |
| Total (A)[9] | | | 1,771,911.77 | 2,081,433.68[10] | 3,853,345.45 |
| Total (B)[11] | | | 1,772,040.53 | 2,081,592.33 | 3,853,632.86 |

The WBO determined that, even though the amount resulting from the income tax examination was $14,543,098 and even though the amount resulting from the employment tax examination was $3,853,345.45, the award due to petitioner was a discretionary award governed by section 7623(a) because the amounts "in dispute" include only amounts attributable to whistleblower information. The resulting award

[5] These four general ledger accounts are: (1) Employee relations—non sales, (2) Employee relations—sales, (3) Sales meetings/rallies, and (4) Rec Sales.

[6] The administrative record states that this amount is $1,112,277.00, the 38-cent difference due to rounding.

[7] This interest computation does not include additional interest for 1Q 2006 to 2Q 2007.

[8] This interest computation includes additional interest for 1Q 2006 to 2Q 2007.

[9] This total does not include additional interest for 1Q 2006 to 2Q 2007.

[10] The administrative record states that this amount is $2,081,433.67, a difference of one cent.

[11] This total includes additional interest for 1Q 2006 to 2Q 2007.

**[*6]** determination (Final Decision Under Section 7623(a)), made on September 4, 2015, was appealed to this Court by petitioner. We held that the amounts in dispute in this case included proceeds that were collected, whether or not attributable to petitioner's information. *Smith v. Commissioner*, 148 T.C. 449, 460 (2017). In 2020 we remanded the case to the WBO for it to consider the award under the mandatory provision of section 7623(b). On April 20, 2021, the WBO issued a supplemental determination of the award due to petitioner (Supplemental Determination Under Section 7623(b)). The WBO determined that the amount collected on the basis of information petitioner provided was $3,492,622.86,[12] that the award percentage under section 7623(b) was 15%, and that the award was therefore $523,893.43. The WBO also determined that the award would be reduced by budgetary sequestration. On April 20, 2021, the WBO issued petitioner its Supplemental Determination Under Section 7623(b). On April 14, 2022, respondent filed a Motion for Summary Judgment asking the Court to sustain the Supplemental Determination Under Section 7623(b). On April 18, 2022, petitioner filed a Motion for Summary Judgment asking the Court to hold that the Supplemental Determination Under Section 7623(b) was erroneous. We will grant respondent's Motion for Summary Judgment and sustain the Supplemental Determination Under Section 7623(b).

*Background*

I.    *Petitioner's claim submission*

Petitioner submitted Form 211, Application for Award for Original Information, with signature dated July 16, 2008, and a cover letter dated July 28, 2008. Petitioner's Form 211 was stamped received by the WBO on August 4, 2008.

According to his Form 211, petitioner began working with TAXPAYER1 as a sales representative in YEAR. His Form 211 asserted that (1) TAXPAYER1 had systematically engaged in bartering gift certificates in exchange for SERVICE performed by TAXPAYER1; (2) TAXPAYER1 failed to report the income from such bartering; and (3) TAXPAYER1 provided these gift certificates to its employees as compensation, without reporting such compensation to the employees or

---

[12] The sum of $1,720,582.33 and $1,772,040.53.

[*7] paying the associated employment tax.[13]  Petitioner's Form 211 also stated:

> As a new employee, the whistleblower was given a gift basket containing "gift certificates" as a welcoming present.  He later learned that it was normal practice in his office, as well as other offices throughout the United States, to sell [SERVICE] in exchange for gift certificates. These types of transactions were not coded as barter income and were purposely billed to the customer reflecting no compensation for the [SERVICE].

Petitioner's Form 211 related to "tax years 2004 through 2007." Petitioner's Form 211 stated: "Not only does the taxpayer fail to report the bartering income, but also these gift certificates are kept by management and by employees without employment tax being paid on such compensation."

On September 4, 2008, the WBO issued an acknowledgment letter to petitioner assigning claim No. 29-82712.  The letter advised that Whistleblower Analyst (WBO Analyst) Robert Gardner was initially assigned to petitioner's claim.

Claim No. 29-82712 was renumbered 2009-002721 when it migrated to the WBO's new Entellitrak (also known as "e-Trak") claim management system.

---

[13] On the Form 211 petitioner made the following statement:

[PUBLICATION] (the "taxpayer") . . . has systematically, and on an annual basis, engaged in Bartering, thereby receiving Bartering Income to the extent of millions of dollars per year.  Many (Millions of Dollars) of the [SERVICE] in the [word redacted by the Court] are paid with by gift certificates by the customer. . . . Not only does the taxpayer fail to report the bartering income, but also these gift certificates are kept by management and by employees without employment tax being paid on such compensation.

The particular page of the administrative record on which the quoted matter is found is page SMI-R-000652.

We observe that the Form 211 stated that the entity that engaged in the bartering transaction was PUBLICATION, not TAXPAYER1.  Petitioner's Response to Motion for Summary Judgment does not dispute that the statement in question was intended to refer to TAXPAYER1.

[*8]   In November 2008 petitioner's claim was re-assigned from WBO Analyst Gardner to WBO Analyst Katherine Onken.

II.   *Transmission of claim to LMSB Exam*

On December 4, 2008, WBO Analyst Onken sent petitioner's claim to the IRS Large & Mid-Sized Business Division (LMSB), via a memorandum addressed to the LMSB Industry Director, Communications, Technology and Media (CTM).

LMSB-CTM Subject Matter Expert (SME) Felipe Castellanoz began to review petitioner's claim to determine whether to send it to the field for examination.

On February 12, 2009, SME Castellanoz spoke to petitioner's counsel to discuss some followup questions and request additional information regarding petitioner's claim.

On February 13, 2009, petitioner's counsel sent a fax to SME Castellanoz with further answers to some of the questions posed on February 12, 2009.

On February 24, 2009, SME Castellanoz sent a memorandum to Mary Faraldo, Team Manager of LMSB Examination Group 1647 (Examination Group 1647) referring petitioner's claim for examination by Examination Group 1647.  The memorandum stated that "AIMS [Account Information Management System] controls have been established" for tax year ending (TYE) 3/31/07 and TYE 3/31/08.

On April 6, 2009, SME Castellanoz informed WBO Analyst Onken that petitioner's claim had been assigned to Examination Group 1647.

On October 1, 2010, LMSB was renamed Large Business & International (LB&I).

On June 9, 2011, the WBO exchanged email correspondence with LB&I SME Melvin Louie and learned that the Form 1120, U.S. Corporation Income Tax Return, examination of TAXPAYER1 had been

[*9] expanded from TYE 3/31/07 and TYE 3/31/08 to include TYE 3/31/09 and TYE 3/31/10.[14]

On September 26, 2011, petitioner submitted supplemental information in correspondence to the WBO, stating that the claim issue should be considered for years prior and subsequent to the years submitted in petitioner's original claim.[15] The WBO reviewed petitioner's September 26, 2011, correspondence.[16]

---

[14] As discussed *infra* part II.A, the examination of TAXPAYER1 was part of the examination of the consolidated group of which TAXPAYER1 was a member.

[15] The statement in the text was asserted in respondent's Motion for Summary Judgment. Petitioner's Objection to Motion for Summary Judgment objected to the assertion because it is misleading:

> Respondent is attempting to mislead the court that the audit was expanded by Respondent prior to being informed through a supplement by Petitioner stating the claim issue should be considered in years prior and subsequent to the years submitted in Petitioner's original claim. The reality is that Petitioner informed Respondent of this fact in the original claim when he stated that the taxpayer "has systematically and on an annual basis engaged in" this tax scheme.

The administrative record includes a letter of September 26, 2011, from Thomas C. Pliske of the Tax Whistleblower Law Firm, LLC. The letter appears at pages SMI-R-000217 to SMI-R-000221 of the administrative record. The letter stated that its purpose was to "supplement and clarify the claim as stated within this letter." The letter stated: "The primary issue raised in the initial 211 Claim submission was unreported barter income by the taxpayer and is an ongoing issue not only affecting the years identified in the submission but years prior and subsequent to the years submitted." The letter also stated that the "Whistleblower is supplementing the original claim to include all subsequent years" (i.e., subsequent to "taxable years 2004, 2005, 2006, and 2007"). The statement in the text is correct.

[16] The statement in the text was asserted in respondent's Motion for Summary Judgment. Petitioner's objection to Motion for Summary Judgment objected to the assertion because it is misleading:

> Respondent is attempting to mislead the court that the audit was expanded by Respondent prior to being informed through a supplement by Petitioner stating the claim issue should be considered in years prior and subsequent to the years submitted in Petitioner's original claim. The reality is that Petitioner informed Respondent of this fact in the original claim when he stated that the taxpayer "has systematically and on an annual basis engaged in" this tax scheme.

In support of the Motion for Summary Judgment, respondent submitted a Declaration of Whistleblower Analyst Teresa Homola (WBO Analyst Homola). The declaration contained the statement: "The WO reviewed the petitioner's September 26,

**[\*10]** On September 29, 2011, WBO Analyst Onken forwarded petitioner's supplemental information to LB&I SME Louie by email, requesting that he forward the information to Examination Group 1647 for association with petitioner's claim.

### A.   *Income tax examination*

When the WBO received petitioner's claim on August 4, 2008, PARENT's consolidated Form 1120 had already been selected for examination but had not yet been assigned (and the examination had not yet been initiated). TAXPAYER1 was a member of the consolidated group of which PARENT was the common parent corporation. Thus TAXPAYER1's return had been identified for examination before receipt of petitioner's claim by the WBO.[17]

In April 2009, approximately two months after the February 24, 2009, date on which petitioner's claim was referred to the field team, an

---

2011 correspondence." Furthermore, petitioner stipulated that the "Whistleblower Office's administrative claim file with respect to Claim # 2009-002721 is comprised of the documents Bates numbered SMI-R-000001-001473" and that pages SMI-R-000001–001473 is "a complete copy of the administrative record in this case." To stipulate that the letter at pages SMI-R-000217 to SMI-R-000221 is part of the WBO's administrative claim file and that it is part of the administrative record suggests that the letter was considered by the WBO. The statement in the text is correct.

[17] The statement in the text was asserted in respondent's Motion for Summary Judgment. Petitioner's Objection to Motion for Summary Judgment objected to the assertion on the following grounds: "Respondent's statement 'taxpayer has been identified for examination prior to receipt of Petitioner's claim' appears to contradict what the whistleblower office concluded in the original determination in which the whistleblower office determined that the whistleblower's 'information caused the investigation.' (Exhibit A, SMI-R-000012)." Petitioner's Form 211 was received by the WBO on August 4, 2008. An August 12, 2013, memorandum from WBO Analyst Mitzel to WBO Acting Program Manager Dawn Applebaum, SMI-R-000056 to SMI-R-000058, includes the following statement: "The 200703 tax return was in Status 08 (selected for exam but not assigned) when the WB allegation was received in the WBO." Furthermore, the Homola declaration states: "The Taxpayer [TAXPAYER1] had been identified for examination prior to receipt of petitioner's claim." The original determination of September 4, 2015, determined that petitioner's information was eligible for a 10% award corresponding to "information that caused the investigation or in cases already under audit, caused an investigation of an issue or issues." Thus, the original determination did not necessarily conclude that TAXPAYER1 was not already under audit when petitioner filed the whistleblower claim. And in the Supplemental Award Recommendation Memorandum, dated March 9, 2021, Homola stated: "[T]he return had been selected for examination prior to receipt of the Whistleblower information . . . ." The statement in the text is correct.

[*11] income tax examination of the consolidated Form 1120 returns for PARENT was initiated.

The assigned income tax examiner was initially Nora Marino. Sonia Pearl took over the case from Marino after the case had already been resolved.

The WBO consulted with both Marino and Pearl regarding the income tax examination. Marino prepared a narrative for the WBO relating to the income tax examination, while Pearl handled the final closing and signed the Form 11369, Confidential Evaluation Report on Claim for Award, which incorporated Marino's narrative. The Form 11369 was signed by Pearl on July 17, 2013, and approved by her manager Salvatore Fristachi on July 17, 2013.

Question 11.A. on Form 11369 ("Did the Service use the information the whistleblower provided to develop specific document requests or other inquiries to the taxpayer?") was answered "yes."

The narrative attached to the income tax examiner Form 11369 detailed the examination results and the relationship of petitioner's claim information to each of the adjustments as follows:

As indicated on the Form 4549-A RAR, [t]he initial year assigned to the income tax examiner was FY 200703. The information provided by the whistleblower was used to identify barter as an audit issue for both the income and employment tax examiners. For purposes of the corporate income tax examination, the documentation included with Form 211 was verified and relied upon by the examiner to determine the types of revenue or expenses which may be adjusted in calculating taxable income. Samples of contracts, customer invoices and gift certificates included in the file were used to test barter income recognition. While no underreporting of barter income was identified, the information provided on and with Form 211 assisted the corporate income tax examiner in the selection of accounts for analysis, i.e. barter usage. No contact was made with the whistleblower by the examiners.

The whistleblower's allegation that employees and managers received gift certificates which were not included in their compensation is correct. When he was employed by the Taxpayer [i.e., TAXPAYER1], the whistleblower was

[*12] the recipient of a "gift basket containing numerous 'gift certificates' as a welcoming present" as indicated on Form 211. The corporate income and employment tax examinations revealed that nothing was included in any employees compensation, including the whistleblower's, for the value of bartered goods and services as well as gift cards and other incentives purchased directly by the Taxpayer. It is unlikely that any employee, including the whistleblower, included the value of these "gifts" in taxable income since they were not included in wages or otherwise reported to them.

The whistleblower's allegation that the Barter Income is unreported is incorrect. The taxpayer maintains detailed reports of Hotel Barter and Local Barter Usage for those items received in exchange for its [SERVICE] services. Hotels and lodging received as barter are often utilized by employees for business related travel. There were no errors noted in the hotel barter usage for the test sample period so no adjustment was proposed to corporate taxable income.

Local Barter assets received by [TAXPAYER1] in exchange for its [SERVICE] services consist of items such as gift certificates and vouchers for janitorial services, restaurant meals, day cruises, rounds of golf, moving services, spas, catering facilities and limousine services. The Taxpayer does not maintain records of barter usage by each individual employee. Analysis of a test sample of barter use indicated that 11.86% constituted additional compensation to employees, and 18% was found to be undocumented and therefore disallowed as deductible expenses in calculating taxable income.

As stated in the Form 11369, the income tax examination found, contrary to petitioner's whistleblower claim, that TAXPAYER1 had properly reported bartering income for the items received in exchange for its SERVICE services. No adjustment was proposed to TAXPAYER1's bartering income.

TAXPAYER1 maintained a general ledger account called "Local Barter Usage" where it recorded business usage of the gift certificates and vouchers received in exchange for its SERVICE services. PARENT

**[*13]** claimed "Other Deductions" for Local Barter Usage on the Forms 1120.

As stated in the income tax examiner Form 11369, petitioner's whistleblower information assisted the income tax examiner in the selection of the "Local Barter Usage" account for analysis.

The income tax examiner found that PARENT did not maintain adequate records, as required under section 274, to substantiate some of its Local Barter Usage deductions. Using a sampling analysis, the income tax examiner determined that "18% was found to be undocumented and therefore disallowed as deductible [corporate] expenses in calculating taxable income."

Including the Local Barter Usage account, the income tax examiner selected seven general ledger accounts for examination. These accounts had the following attributes: (1) PARENT claimed "Other Deductions" for the amounts reflected in the accounts and (2) the accounts either (a) related to meals, travel, and entertainment or (b) appeared to include awards, incentives, or prizes provided to employees. These are the seven general ledger accounts selected for examination:

| | | |
|---|---|---|
| Employee relations—nonsales | 036450 | Adjusted |
| Employee relations—sales | 026450 | Adjusted |
| Sales Meetings/Rallies | 026650 | Adjusted |
| Local Barter Usage | 026955 | Adjusted |
| Hotel Barter Usage | 026960 | Not adjusted |
| Chairman's Club | 026575 | Not adjusted |
| Rec Sales | 026025 | Adjusted |

The income tax examiner made adjustments related to five of the seven general ledger accounts, as indicated in the table above. For the accounts for which adjustments were made, the income tax examiner made a sampling analysis, inferred an error rate regarding income tax

[*14] deductions, and made the adjustment by extrapolating from the error rate.[18]

As a result, the income tax examiner proposed adjustments to disallow a portion of PARENT's deductions for the five general ledger accounts as follows: $1,153,327 for TYE 3/31/07; $1,263,600 for TYE 3/31/08; $1,130,468 for TYE 3/31/09; and $1,004,102 for TYE 3/31/10. Applying a 35% tax rate to these adjustments resulted in an additional tax due of $1,593,024. PARENT agreed to these adjustments.

In addition to the adjustments to the five general ledger accounts, the income tax examiner proposed five other adjustments, which were also agreed to by TAXPAYER1. The Form 4549–B, Income Tax Examination Changes, for PARENT for TYE 3/31/07 through TYE 3/31/10 reflects these five adjustments, which were for (1) stock option expenses, (2) interest expense, (3) amortization of goodwill, (4) inventory capitalization, and (5) bonus accruals.

The agreed-upon and collected deficiency for the income tax adjustments was $14,543,098.[19]

PARENT fully paid the $14,543,098 agreed income tax deficiency as of September 9, 2013.

---

[18] As stated in the income tax examiner Form 11369, the income tax examiner also inferred an error rate for amounts recorded in the Local Barter Usage general ledger account that constituted additional compensation to employees. This was 11.86%. The same type of error rate was inferred for the other four general ledger accounts for which deduction adjustments were made, as shown in the administrative record on pages SMI-R-000262 to SMI-R-000270 and on page SMI-R-000274.

[19] Respondent's Motion for Summary Judgment asserted that the $14,543,098 includes penalties and interest. Respondent cited page SMI-R-000443 in support of the assertion. However, this page of the administrative record has zeroes for penalties and interest. Respondent also cited page SMI-R-000449 in support of the assertion. However, this page of the administrative record has no breakdown of penalties and interest. Respondent cited paragraph 33 of the Homola declaration in support of the assertion. That paragraph repeats the assertion. However, it refers only to the two pages of the administrative record cited in respondent's Motion for Summary Judgment. We conclude that respondent has not shown that the $14,543,098 includes penalties and interest. The conclusion does not affect the merits of respondent's Motion for Summary Judgment, as petitioner does not contend that the correctness of the Supplemental Determination Under Section 7623(b) depends on whether the $14,543,098 includes penalties and interest.

**[\*15]** The income tax examination also resulted in proposed adjustments related to the section 199 domestic production deduction (DPD) for TYE 3/31/07, TYE 3/31/08, TYE 3/31/09, and TYE 3/31/10. PARENT did not agree to the DPD adjustments, and they were sent to the IRS Independent Office of Appeals (Appeals).

PARENT did not reach an agreement with Appeals regarding the DPD adjustments. Appeals issued PARENT a statutory notice of deficiency, which PARENT petitioned to the Tax Court. The Tax Court litigation regarding the DPD issue was eventually resolved through settlement.

Petitioner's whistleblower claim did not contain any documents or information that were used to develop the adjustments to stock option expenses, interest expenses, amortization of goodwill, inventory capitalization, bonus accruals, or the DPD.

In the income tax examiner's Form 11369 dated July 17, 2013, the examiner stated that no assessment was made for TYE 3/31/10 due to a net operating loss carryback from TYE 3/31/12. The income tax examiner further stated that the "barter expense" was not an issue for TYE 3/31/11 because the taxpayer had instituted controls to correct the accounting.

B. *Employment tax examination*

In April 2010 an employment tax examination of TAXPAYER1 and related entities, TAXPAYER2 and TAXPAYER3, was initiated.

The assigned employment tax examiner was Laura Cordero.

The employment tax examination covered the Forms 941, Employer's Quarterly Federal Tax Return, filed by TAXPAYER1, TAXPAYER2, and TAXPAYER3 for calendar years 2006 through 2009.

Although PARENT's Form 1120 was reported on a fiscal year basis (ending March 31), the employment tax returns for TAXPAYER1, TAXPAYER2, and TAXPAYER3 were reported on a calendar year basis. Thus, a 2010 employment tax examination would require information from the Form 1120 for TYE 3/31/11. Because the corporate income tax return for TYE 3/31/11 had not yet been filed at the conclusion of the employment tax examination, the 2010 calendar year was not examined.

[*16] The employment tax examination was conducted to consider petitioner's allegation of gift certificates being provided to employees without being included in income. The employment tax examiners found that TAXPAYER1, TAXPAYER2, and TAXPAYER3 did not properly report the gift certificates—which TAXPAYER1, TAXPAYER2, and TAXPAYER3 received from customers through bartering and provided to their employees—as part of the employees' wages.

The employment tax examiner made the following statements regarding how the information and documents petitioner provided were used in the employment tax examination:

> The information provided by the whistleblower was used to identify barter as an audit issue for both the income and employment tax examiners. For purposes of the employment tax examination, the documentation included with Form 211 was not utilized. Samples of contracts, customer invoices and gift certificates do not verify whether or not these amounts were included in compensation. The information provided on and with Form 211 assisted the employment tax examiner in the selection of accounts for analysis, i.e. barter usage, but it was not useful for evidentiary purposes since it contained estimates and was outside the audit periods.

Employment tax adjustments were made to the Forms 941 for TAXPAYER1 for calendar years 2006 through 2009.

The employment tax examiner used the same Local Barter Usage sampling results used by the income tax examiner, which found that 11.86% of Local Barter Usage constituted additional compensation to employees.

The Local Barter Usage adjustments resulted in additional payroll tax for the 2006, 2007, 2008, and 2009 calendar years of $154,929, $135,746, $120,116, and $85,304, respectively. A 20% accuracy-related penalty relating to the Local Barter Usage adjustments was also assessed. Thus, a total of $595,314 in additional payroll tax and penalties resulted from the Local Barter Usage adjustment.

In addition to the Local Barter Usage adjustment, the employment tax examiner also proposed compensation adjustments related to the following four general ledger accounts: (1) Employee

[*17] relations—non sales; (2) Employee relations—sales; (3) Sales meetings/rallies; and (4) Rec Sales. The total additional employment tax and penalties resulting from adjustments to these four categories totaled $1,112,277 for the 2006, 2007, 2008, and 2009 years.[20]

With respect to the adjustments for (1) Employee relations—non sales, (2) Employee relations—sales, and (3) Sales meetings/rallies, the Form 886–A, Explanations of Items, stated:

> Expenses reclassified as . . . additional salary represented expenditures (primarily through American Express purchases) of gift certificates, group meals and tickets for entertainment events. In reviewing the detail, the auditors noted that the expenses claimed either lacked appropriate substantiation as business events or represented gift certificates or entertainment outings that were given directly to the salespersons as incentives.

With respect to the adjustment for Rec Sales, the Form 886–A stated: "[I]t was found that gift certificates were purchased by territory managers and distributed to salespersons based upon the manager's discretion as incentive for performance." As to all four general ledger account expense categories, the WBO stated: "The 886A does not breakout the portion of each category adjustment related to gift cards. Without such a breakdown the entire category will be attributed to collected proceeds."

The adjustments to the five expense categories involving gift certificates (Local Barter Usage, Employee relations—non sales, Employee relations—sales, Sales meetings/rallies, and Rec Sales) resulted in total additional payroll tax, penalties, and interest for the taxable years 2006, 2007, 2008, and 2009 of $588,290, $616,620,

---

[20] The statement in the text was asserted in Respondent's Motion for Summary Judgment. Petitioner's Objection to Motion for Summary Judgment objected to the assertion without stating that it is incorrect. Respondent cited page SMI-R-001434 in support of the assertion. However, page SMI-R-001434 does not reflect the asserted amounts. The assertion was stated in the declaration of Homola that respondent submitted in support of the Motion for Summary Judgment. Homola's declaration refers only to page SMI-R-001434, the same page cited in respondent's Motion for Summary Judgment. However, we observe that the statement in the text is supported by other portions of the administrative record. The $1,112,277 amount is equal to $1,772,040.53 (an amount appearing on page SMI-R-001135) minus $64,449.15 (an amount appearing on page SMI-R-001135) minus $595,314 (an amount that can be calculated from page SMI-R-000255).

[*18] $341,046, and $226,084, respectively.[21]    Thus, a total of $1,772,040.53 in additional employment tax, penalties, and interest resulted from adjustments to these five expense categories.

The employment tax examiner also proposed an adjustment to a sixth general ledger expense category called the "Chairman's Club."  The Chairman's Club adjustment was described as disallowing travel expenses for administrators, executives and other high-earning salespersons to attend yearly events, sponsored by TAXPAYER1, TAXPAYER2, and TAXPAYER3 at resorts in the Bahamas and Cancun.

The Chairman's Club adjustment did not involve bartering or gift certificates, and petitioner's claim did not contain any documents or information that related to the Chairman's Club adjustments.

The Chairman's Club adjustments resulted in additional payroll tax, penalties and interest for the taxable years 2006, 2007, 2008, and 2009 of $861,546, $522,958, $247,781, and $449,307, respectively.[22] Thus, a total of $2,081,592 was collected as a result of the Chairman's Club adjustments.

Although the employment tax examination encompassed three entities which filed separate payroll tax returns, the total payroll tax examination results for the PARENT consolidated group were combined on Form 2504, Agreement to Assessment and Collection and Acceptance of Overassessment (Excise or Employment Tax), and the employment tax deficiency was assessed against only one entity, TAXPAYER1.

The total employment tax deficiency, including interest, was $3,853,633 (the sum of $1,772,040.53 and $2,081,592).[23]  TAXPAYER1,

---

[21] The statement in the text was asserted in Respondent's Motion for Summary Judgment.  Petitioner's Objection to Motion for Summary Judgment objected to the assertion without stating that it is incorrect.  Respondent cited pages SMI-R-000251 to SMI-R-000273 in support of the assertion.  However, these pages do not reflect the asserted amounts.  The assertion was stated in the declaration of Homola.  Homola's declaration also refers to pages SMI-R-000251 to SMI-R-000273.  However, we observe that the asserted amounts are reflected on page SMI-R-001135.

[22] The statement in the text was asserted in respondent's Motion for Summary Judgment.  Petitioner's Objection to Motion for Summary Judgment objected to the assertion without stating that it is incorrect.  The assertion is supported by page SMI-R-001135, which is among the pages respondent cited.

[23] The statement in the text was asserted in respondent's Motion for Summary Judgment.  Respondent did not cite any pages of the administrative record in support

[*19] TAXPAYER2, and TAXPAYER3 agreed to these adjustments and paid the employment tax deficiency in full as of May 29, 2012. The WBO noted that the refund statute expiration date for the employment tax payment was May 29, 2014.

At the conclusion of the employment tax examination, the employment tax examiner prepared and submitted Form 11369 to the WBO that documented her findings and was signed on January 23, 2012.

The employment tax examiner marked "yes" on line 11.A. of Form 11369 in response to the question "[d]id the Service use the information the whistleblower provided to develop specific document requests or other inquiries to the taxpayer?"

The employment tax examiner also marked "yes" on line 13.A. of Form 11369 in response to the question "[d]id the whistleblower participate in the actions that led to the underpayment of tax, or to the violation of the internal revenue laws?"

On February 3, 2012, after reviewing the Form 11369 from the employment tax examiner, WBO Analyst Onken emailed LB&I SME Louie with some additional followup questions for the field team. WBO Analyst Onken requested additional explanation of how petitioner's information was used during the examination, to expand upon the employment tax examiner's answer to Form 11369, line 11.A. WBO Analyst Onken also requested additional explanation of how the whistleblower participated in the tax noncompliance, to expand upon the employment tax examiner's answer to Form 11369, line 13.A.

LB&I SME Louie forwarded WBO Analyst Onken's February 3, 2012, email to the employment tax examiner.

On February 7, 2012, the employment tax examiner modified the Form 11369 narrative attachment in response to WBO Analyst Onken's request for additional information and emailed the revised Form 11369 narrative attachment to LB&I SME Louie, with a copy to WBO Analyst Onken.

---

of the assertion. However, we observe that the assertion is supported by page SMI-R-001300.

**[*20]** The narrative attachment to the employment tax examiner's Form 11369 stated:

> The Taxpayer's revenue is primarily generated by the sale of [SERVICE] . . . . As an incentive to their sales staff, gift certificates were given as prizes and gifts during sales meetings and rallies. Other gift certificates were distributed to employees as they approached their expiration dates. Payroll tax adjustments were proposed for those assets which had been provided to or used by employees. The test sample error rate of 11.86% was extrapolated to the entire Local Barter Usage account in each year. The adjustment for additional wages was $555,301 in 2006, $486,544 in 2007, $430,524 in 2008 and $336,339 in 2009. This resulted in additional payroll tax of $154,929 in 2006, $135,746 in 2007, $120,116 in 2008 and $85,304 in 2009 directly attributable to the whistleblower's information. An accuracy penalty of 20% was assessed on the total payroll tax deficiency. The Alternative Argument provided in the legal memorandum, a payment made to an employee is a taxable wage subject to employment taxes and Federal Income Tax Withholding was utilized to support the payroll tax adjustment related to the distribution of gift certificates to employees. No contact was made with the whistleblower by the examiners.
>
> All remaining payroll tax adjustments result from unrelated issues developed by the examiners. It is unlikely that an employment tax referral would have been submitted or an employment tax specialist assigned to this case without the whistleblower's information. The employment tax examiner did not prepare an examination plan.

After reviewing the revisions, WBO Analyst Onken found that the "narrative provides additional information and is accepted as adequate."

After receiving the revised Form 11369, WBO Analyst Onken emailed the employment tax examiner for further clarification regarding subsequent year examinations for 2010 and 2011. The employment tax examiner responded that she would not be conducting examinations for 2010 and 2011, because the TYE 3/31/10 corporate

**[\*21]** return had not yet been filed at the time the 2006 through 2009 payroll tax adjustments were proposed.

WBO Analyst Onken also followed up to ask the employment tax examiner: "Will you be recommending that this issue be examined in next cycle? Or do you think the taxpayer will correct the unaudited periods." The employment tax examiner responded in a February 7, 2012, email:

> I think the taxpayer will either adjust the 2011 payroll records, with a significant increase in the last quarter's wages from the third quarter or an M-1/M-3 expense disallowance adjustment will be made on the corporate return. As far as the 2010 year, due to the significant number of affected employees, I do not think that the T/P will issue corrected W-2's (or amend the payroll tax returns) and would recommend that this issue continue to be examined in the next cycle. IDRS should be checked to see if the taxpayer made any corrections prior to assigning an examiner.

On October 25, 2012, WBO Analyst Onken checked the Examination Returns Control System and AIMS and found that the Forms 1120 for TYE 3/31/07 to 3/31/11 were in "Status 12," which means the examination is in process. She also checked to see whether the employment tax examination had been expanded into 2010 or beyond.

On October 25, 2012, WBO Analyst Onken sent an email to LB&I SME Louie to learn the status of the TYE 3/31/11 income tax examination, and to confirm whether there would be an employment tax examination conducted to investigate petitioner's claim for 2010 and forward.

On November 20, 2012, LB&I SME Louie sent an email to Pearl asking: "[P]lease let me know whether or not: 1) You are (or will be) examining the 201103 [i.e., TYE 3/31/11] Form 1120 for issues raised by the whistleblower; 2) Employment Tax is (or will be) examining 2010 or subsequent periods."

On November 20, 2012, Pearl responded in an email to LB&I SME Louie:

> 1) I will not be examining [TYE 3/31/11] F. 1120 issues raised by the whistleblower based on the advice of the prior

[*22] RA. The [TYE 3/31/11] was filed after the audit was underway and the errors which led to prior period adjustments were corrected.

2) Similarly Employment Tax made the determination not to examine [the first quarter of 2010] or any subsequent periods as the TP corrected its accounting for the items adjusted in earlier years.

LB&I SME Louie forwarded the email to WBO Analyst Onken.

III.   *WBO's original 2015 decision under section 7623(a)*

In approximately February 2013 petitioner's claim was reassigned from WBO Analyst Onken to WBO Analyst Steve Mitzel.

After reviewing the Forms 11369 and supporting documents received from the income tax and employment tax examiners, the WBO waited for the two-year refund period of limitations to expire with respect to TAXPAYER1's income and employment tax payments.

In April 2015 WBO Analyst Mitzel prepared an Award Recommendation Memorandum.

In the Form 11369 submitted by the employment tax examiner, the examiner had expressed the opinion that $595,314 of the $3,853,345.45 collected in the employment tax examination was "directly attributable to petitioner's information."[24]

---

[24] The statement in the text was asserted in respondent's Motion for Summary Judgment. Petitioner's Objection to Motion for Summary Judgment objected to the assertion without stating that it is incorrect. Respondent cited page SMI-R-000255 in support of the assertion. Page SMI-R-000255 states that the employment tax deficiencies directly attributable to petitioner's information were $154,929 for 2006, $135,746 for 2007, $120,116 for 2008, and $85,304 for 2009. The same page also states that a 20% penalty was assessed on these deficiencies. The sum of these deficiencies is $496,095, which when added to 20% of this sum, is $595,314. Page SMI-R-000255 includes enough information to calculate that $595,314 is the sum of taxes and penalties collected that relate to the adjustments as to the Local Barter Usage adjustment. However, the $595,314 amount does not include interest, unlike the $3,853,345.45 amount, which includes interest. Page SMI-R-000255 does not reflect the $3,853,345.45 amount. The assertion in the text was stated in the declaration of Homola. Homola's declaration refers only to page SMI-R-000255, the same page cited in respondent's Motion for Summary Judgment. However, we observe that the

**[\*23]** However, WBO Analyst Mitzel found that a larger portion of the proceeds collected pursuant to the employment tax examination—$1,771,911.77 out of the total $3,853,345.45—was attributable to petitioner's information.[25] WBO Analyst Mitzel determined that even though the issues were not specifically related to bartering, these additional adjustments were related to the provision of gift certificates to employees without including them in the employees' income, and thus related to petitioner's whistleblower information.

The remaining $2,081,433.68 of adjustments related to "The Chairman's Club"—travel packages to events, sponsored by TAXPAYER1, at offshore resorts which TAXPAYER1 provided to certain employees—which the IRS found to constitute compensation not included in the employees' income.[26] WBO Analyst Mitzel determined that the Chairman's Club adjustments did not relate to the information petitioner provided.

The Form 886–A attached to the employment tax Form 11369 did not break out the portion of each category of adjustment related to gift

---

$3,853,345.45 amount is found on page SMI-R-000050. The reason this amount is less than the $3,853,633 amount discussed *supra* Part II.B is that this amount does not include additional interest for 1Q 2006 through 2Q 2007.

[25] In respondent's Motion for Summary Judgment, respondent asserted the following: "However, WO Analyst Mitzel found that a larger portion of the proceeds collected pursuant to the employment tax examination—$1,771,991.77 out of a total $3,853,345.45—was attributable to petitioner's information." Petitioner's Objection to Motion for Summary Judgment objected to the assertion without stating that it is incorrect. Respondent cited only Homola's declaration in support of the assertion. The assertion was stated in the declaration of Homola. Homola's declaration does not refer to a page of the administrative record. And we are unable to find the $1,771,991.77 amount in the administrative record. However, we observe that SMI-R-000050 reflects that WBO Analyst Mitzel found that the portion of the proceeds collected pursuant to the employment tax examination—$1,771,911.77 out of a total of $3,853,345.45—was attributable to petitioner's information. The reason why this amount is less than the $1,772,040.53 amount discussed *supra* Part II.B is that this amount does not include additional interest for 1Q 2006 through 2Q 2007.

[26] The statement in the text was asserted in respondent's Motion for Summary Judgment. Petitioner's Objection to Motion for Summary Judgment objected to the assertion without stating that it is incorrect. Respondent cited only Homola's declaration in support of the assertion. Homola's declaration does not refer to a page of the administrative record. However, we observe that the asserted amount can be calculated from the amounts reflected in SMI-R-000050. Specifically, $2,081,433.68 is the difference between $3,853,345.45 and $1,771,911.77. The reason why this amount is less than the $2,081,592 amount discussed *supra* Part II.B is that this amount does not include additional interest for 1Q 2006 through 2Q 2007.

[*24] certificates. Therefore, WBO Analyst Mitzel attributed all of the compensation adjustments to petitioner's information, with one exception: He determined that the Chairman's Club expense category was not attributable to petitioner's allegations regarding barter income or compensation related to gift certificates.

With respect to the income tax examination, the income tax examiner's Form 11369 opined that $1,593,024 of the $14,543,098 collected in the income tax examination was attributable to petitioner's information.[27]  The income tax examiner stated that the information petitioner provided was used to identify barter as an audit issue for the income tax examination as well as the employment tax examination. While no underreporting of bartering income was identified in the examination, the income tax examination resulted in the disallowance of certain deductions for the use of barter assets that were not properly documented.  However, WBO Analyst Mitzel disagreed with the examiner's reasoning in attributing the barter expense disallowance to petitioner's information and concluded that none of the adjustments in the income tax examination was attributable to petitioner's information.

The WBO computed the amount in dispute as $1,771,911.77.[28] Because this amount was less than $2 million, the WBO processed petitioner's claim as a discretionary award under section 7623(a) rather than a mandatory award under section 7623(b).

The *Internal Revenue Manual* (IRM) procedures for section 7623(a) claims in effect during the 2015 whistleblower administrative proceeding for this case stated that

> [f]or specific and responsible information that caused the investigation or, in claim files already under audit, materially assisted in the development or identification of an issue or issues and resulted in the recovery, or was a

---

[27] Neither amount included penalties or interest.

[28] Respondent's Motion for Summary Judgment asserted that a slightly different amount was computed: "The WO computed the 'amount in dispute' as $1,771,991.77."  Petitioner's Objection to Motion for Summary Judgment objected to the assertion without stating that it is incorrect.  Respondent cited Homola's declaration in support of the assertion.  Homola's declaration includes the assertion in respondent's Motion for Summary Judgment.  Homola's declaration does not refer to a page of the administrative record.  However, we observe that page SMI-R-000053 includes the following statement by WBO Analyst Mitzel: "My determination of the amount in dispute for employment tax related issues totals $1,771,911.77."

[*25] direct factor in the recovery, the award shall be 15 percent of the amounts recovered.

IRM 25.2.2.9.1(2)(a) (June 18, 2010). The IRM further stated that "[f]or information that caused the investigation or, in claim files already under audit, caused an investigation of an issue or issues, and was of value in the determination of tax liabilities although not specific, the award shall be 10 percent of the amount recovered." IRM 25.2.2.9.1(2)(b). The IRM further provided that "[f]or information that causes the investigation or investigation of an issue, but had no direct relationship to the determination of tax liabilities, the award shall be 1 percent of the amounts recovered." IRM 25.2.2.9.1(2)(c).

Accordingly, the WBO proposed an award of 10% of the proceeds collected that were attributed to petitioner's information, and 1% of the proceeds collected that were not attributed to petitioner's information.

On July 27, 2015, the WBO issued a Preliminary Award Recommendation Under § 7623(a) of $183,551.11.

On August 10, 2015, petitioner submitted comments regarding the Preliminary Award Recommendation Under Section 7623(a), arguing that the amount in dispute should include "the total of $18,396,443.44 [that] resulted from the action(s) with which the IRS proceeded based on the information provided by the whistleblower . . . even though the whistleblower substantially contributed to only $1,771,911.77." (Alteration in original.)

On September 4, 2015, after considering petitioner's comments, the WBO issued to petitioner a Final Decision Under Section 7623(a).

On October 2, 2015, petitioner filed his Petition, asking this Court to find that the WBO abused its discretion in (1) determining that petitioner was entitled to an award under section 7623(a) and not section 7623(b); (2) determining that petitioner was entitled to an award of 10% of certain proceeds and 1% of other proceeds, and not the threshold percentage of 15% of all the collected proceeds; and (3) reducing petitioner's award by 7.3% for sequestration. Petitioner asked the Court to compel respondent to "pay [p]etitioner the threshold percentage of 15% to 30% of all collected proceeds" and pay the amount respondent withheld due to sequestration.

**[\*26]** IV.  *Tax Court Opinion and remand*

On September 12, 2016, petitioner filed a Motion for Summary Judgment requesting that the Court make several conclusions, including that the "amounts in dispute" in this case exceeded $2 million, and that therefore the WBO erred in making a determination under section 7623(a).

On June 7, 2017, the Tax Court issued its Opinion granting petitioner's Motion for Summary Judgment with respect to the "amounts in dispute" issue, holding that the amounts in dispute in this case included proceeds that were collected, whether or not attributable to petitioner's information:

> The section 7623(b)(5)(B) phrase "amounts in dispute"[29] is not specifically limited to only those amounts directly or indirectly attributable to the whistleblower information.  Once the monetary thresholds are met and the Government recovers "collected proceeds" resulting from the action, the mandatory provisions of subsection (b)(1) or (2) apply.

*Smith*, 148 T.C. at 460.  The Court further stated:

> In the case before the Court, respondent proceeded using petitioner's information, and the examination resulted in nearly $20 million of tax in dispute, of which almost $2 million was directly or indirectly attributable to petitioner's information.  Those circumstances satisfy the purely mathematical threshold of section 7623(b)(5).

*Id.* at 462–63.

The Court did not determine the amount of section 7623(b) "collected proceeds" directly attributable to petitioner's information in

---

[29] After the Tax Court's Opinion was issued in this case, section 7623 was amended to add the definition of "proceeds" in subsection (c), and section 7623(b)(5)(B) was amended to read "proceeds in dispute" rather than "amounts in dispute." Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 41108(a), (c), 132 Stat. 64, 158. The amendment was effective for information provided for which a final determination for an award had not been made before February 9, 2018.  *Id.* § 41108(d), 132 Stat. at 158–59.  A final determination of petitioner's award was not made before February 9, 2018.  *See Lewis v. Commissioner*, 154 T.C. 124, 133 (2020).  Therefore, the award for petitioner's information is governed by the amended statute.

**[\*27]** its Opinion but stated that once the section 7623(b)(5)(B) threshold has been met, "[t]he next statutory step would be to determine what portion of those collected proceeds resulted from the whistleblower's information or claim." *Smith*, 148 T.C. at 461.

On August 21, 2017, petitioner filed a Motion to Shift the Burden of Proof.

On August 31, 2017, respondent filed a Motion to Remand requesting that the Court order this case remanded to the WBO for a redetermination of petitioner's award amount pursuant to section 7623(b).

On September 28, 2017, respondent filed a Response to Motion to Shift Burden of Proof.

On October 6, 2017, petitioner filed a Response to Motion to Remand.

On October 20, 2017, respondent filed a Reply to Response to Motion to Remand.

On October 15, 2019, petitioner's claim was re-assigned from WBO Analyst Mitzel to WBO Analyst Homola, and she is currently responsible for petitioner's claim.

On April 22, 2020, the Court issued an order granting respondent's Motion to Remand and remanding this case to the WBO for additional investigation and a Supplemental Determination Under Section 7623(b).

V.     *WBO's Supplemental Determination Under Section 7623(b)*

On remand, petitioner's claim was assigned to WBO Analyst Homola, who conducted a supplemental investigation of petitioner's claim.

WBO Analyst Homola determined that $1,772,040.53 of the collected proceeds from the employment tax examination was attributable to petitioner's information. This amount differs from the $1,771,911.77 of collected proceeds used in the 2015 section 7623(a) award because it includes additional interest related to the employment tax examination for the tax periods 1Q 2006 to 2Q 2007 that was omitted from the prior section 7623(a) award calculation.

**[*28]**  In addition, WBO Analyst Homola determined that $1,720,582.33 of the collected proceeds from the income tax examination was attributable to petitioner's information.  On this point WBO Analyst Homola's determination differed from WBO Analyst Mitzel's prior determination, which attributed none of the income tax examination proceeds to petitioner.  The $1,720,582.33 amount represented the collected proceeds from the adjustments related to the following five general ledger accounts: Employee relations—non sales, Employee relations—sales, Sales Meetings/Rallies, Rec Sales, and Local Barter Usage.[30]  The $1,720,582.33 amount consisted of tax, penalties, and interest.

WBO Analyst Homola's Supplemental Award Recommendation Memorandum to WBO Acting Program Manager Applebaum explained that "[w]hile no underreporting of bartering income was identified, the information provided on and with the Form 211 assisted the corporate income tax examiner in the selection of accounts for analysis, i.e. barter usage."

After reviewing the administrative claim file and considering the positive and negative factors set forth in Treasury Regulation § 301.7623-4(b), WBO Analyst Homola recommended a 15% award. WBO Analyst Homola therefore determined a recommended award of $523,893.43 (before sequestration).  The $523,893.43 amount is equal to (15%)($1,772,040.53 + $1,720,582.33).

---

[30] Paragraph 107 of respondent's Motion for Summary Judgment states that $1,720,582.33 was determined by WBO Analyst Homola to be the "collected proceeds from the adjustments disallowing Local Barter Usage."  Petitioner's Objection to Motion for Summary Judgment does not disagree with this statement.  Page SMI-R-001438 of the Supplemental Award Recommendation Memorandum determined that the following adjustments to "Other deductions/GL Account" were attributable to petitioner's information: $1,153,327 for TYE 3/31/07, $1,263,600 for TYE 3/31/08, $1,130,468 for TYE 3/31/09, and $1,004,102 for TYE 3/31/10.  The sum of the four annual amounts is $4,551,497.  WBO Analyst Mitzel's August 12, 2013 memorandum to WBO Acting Program Manager Applebaum stated that the "income tax examiner proposed adjustments totaling $4,551,497.00 to other deductions."  The memorandum further explained that the "income tax examiner identified adjustments to other deductions in the following general ledger accounts."  The memorandum then named five general ledger accounts: Employee Relations—non sales, Employee Relations—sales, Local Barter Usage, Rec Sales, and Sales Meetings/Rallies.  We conclude that the $1,720,582.33 referred to in respondent's Motion for Summary Judgment represents the proceeds collected as a result of the disallowance of deductions related to all five general ledger accounts, not just Local Barter Usage.

**[\*29]** On September 24, 2020, the WBO issued a Supplemental Preliminary Award Recommendation Letter (Supplemental PARL) to petitioner.

The Supplemental PARL stated that the recommended award amount ($523,893.43) would be reduced by a sequestration amount that would reflect the sequestration percentage applicable for the fiscal year the award would be paid. The Supplemental PARL stated that if the award were paid in the fiscal year 2020, the applicable sequestration percentage would be 5.9% and the postsequestration award would be $523,893.43 \times (1-.059) = \$492,983.72$.

On September 25, 2020, petitioner sent respondent's counsel a letter which contained comments on the Supplemental PARL. Respondent's counsel forwarded this correspondence to the WBO.

On November 9, 2020, petitioner submitted a Response to Summary Report to the WBO, which requested a more detailed explanation of the Supplemental PARL.

On January 13, 2021, the WBO issued its Detailed Report to petitioner.

On January 19, 2021, petitioner returned the Detailed Report Response Form to the WBO, in which petitioner disagreed with the Supplemental PARL and elected to review information from the WBO's administrative claim file.

On January 22, 2021, the WBO's administrative claim file was delivered to petitioner for review.

The Detailed Report Response Form stated that petitioner's comments must be submitted within 30 days from the date of delivery of WBO's administrative claim file.

On February 5, 2021, petitioner submitted comments to the WBO, and the WBO considered petitioner's comments.

After consideration of petitioner's February 5, 2021, comments, WBO Analyst Homola concluded that no change to the award determination was necessary and addressed petitioner's comments in her Supplemental Award Recommendation Memorandum, which was dated March 9, 2021.

**[\*30]** On March 29 and April 17, 2021, after the 30-day comment window, petitioner submitted additional correspondence to the WBO which was reviewed by the WBO.[31]

On April 20, 2021, the WBO issued petitioner its Supplemental Determination Under Section 7623(b), which stated that the amount collected using information petitioner provided was $3,492,622.86, the determined award percentage was 15%, and the presequestration award was $523,893.43, equal to $3,492,622.86 × 15%. The Supplemental Determination Under Section 7623(b) stated that the award would be reduced by a sequestration amount that would reflect the sequestration percentage applicable for the fiscal year the award would be paid. The Supplemental Determination Under Section 7623(b) stated that if the award were paid in the fiscal year 2021, the applicable sequestration percentage would be 5.7% and the postsequestration award would be $492,983.72. The computation was erroneous. The product of $523,893.43 and (1–.057) is $494,031.50.

On August 13, 2021, the parties filed a First Stipulation of Facts. As part of the First Stipulation of Facts, the parties agreed that Exhibit A to the First Stipulation of Facts, which is Bates numbered SMI-R-000001 through SMI-R-001473, was the entire administrative record at the time respondent determined the award reflected in the April 20, 2021, Supplemental Determination Under Section 7623(b).

On April 14, 2022, respondent filed a Motion for Summary Judgment.

On April 18, 2022, petitioner filed a Motion for Summary Judgment.

On June 21, 2022, petitioner filed a Response to respondent's April 14, 2022, Motion for Summary Judgment.

On June 21, 2022, respondent filed a Response to petitioner's April 18, 2022, Motion for Summary Judgment.

---

[31] An additional letter dated March 2, 2021 and referenced in petitioner's April 17, 2021, letter was not received by WBO Analyst Homola before the issuance of the final award determination and is not included in the administrative record.

**[\*31]**                                          *Discussion*

The purpose of summary judgment is to expedite litigation and avoid unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). Ordinarily, under Rule 121(a)(2), the Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). However, the ordinary summary judgment standard is not generally apt in a case like this one, where we must confine ourselves to the administrative record to decide whether there has been an abuse of discretion. *See Van Bemmelen v. Commissioner*, 155 T.C. 64, 78 (2020). In such a case, generally there will be no trial on the merits. *Id.* at 79. Our review of the final agency action is governed by the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706. Therefore, summary judgment serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Van Bemmelen v. Commissioner*, 155 T.C. at 79.

Petitioner contends that respondent bears the burden of proof regarding the propriety of the Supplemental Determination Under Section 7623(b). Our resolution of the parties' Motions for Summary Judgment does not depend on which party bears the burden of proof. Accordingly we deny as moot petitioner's Motion to Shift the Burden of Proof.

I.      *The WBO did not err in determining that the amount to be multiplied by the award percentage was the sum of $1,772,040.53 and $1,720,582.33.*

In its Supplemental Determination Under Section 7623(b), the WBO determined the dollar amount to multiply by the section 7623(b) award percentage. It determined that this dollar amount was the sum of $1,772,040.53 and $1,720,582.33.

The $1,772,040.53 amount was the portion of the proceeds collected from the employment tax examination that related to the transfer of gift certificates to employees. The transfers fell into the following five expense categories, which correspond to general ledger accounts: (1) Local Barter Usage, (2) Employee relations—nonsales, (3) Employee relations—sales, (4) Sales Meetings/Rallies, and (5) Rec Sales. The employment tax examination also resulted in the collection

[*32] of $2,081,592 in proceeds related to the disallowance of deductions for the Chairman's Club. These Chairman's Club deductions did not relate to the transfer of gift certificates to employees.

The $1,720,582.33 amount was the portion of the proceeds collected from the income tax examination that related to the transfer of gift certificates to employees. The transfers fell into the following five expense categories, which correspond to general ledger accounts: (1) Local Barter Usage, (2) Employee relations—nonsales, (3) Employee relations—sales, (4) Sales Meetings/Rallies, and (5) Rec Sales. The income tax examination also resulted in the collection of proceeds related to the disallowance of five categories of deductions other than the five expense categories: (1) stock option expenses, (2) interest expense, (3) amortization of goodwill, (4) inventory capitalization, and (5) bonus accruals. These five other categories of deductions did not relate to the transfer of gift certificates to employees.

Section 7623(a) authorizes the Secretary of the Treasury to pay such sums as he deems necessary for (1) detecting underpayments of tax or (2) detecting and bringing to trial and punishment persons guilty of violating the internal revenue laws or conniving at the same. Section 7623(b)(1) provides that "[i]f the Secretary proceeds with any administrative or judicial action described in [section 7623(a)] based on information brought to the Secretary's attention by an individual, such individual shall, subject to [section 7623(b)(2)], receive as an award at least 15 percent but not more than 30 percent of the proceeds collected as a result of the action (including any related actions)." Section 7623(b)(1) further provides: "The determination of the amount of such award by the Whistleblower Office shall depend upon the extent to which the individual substantially contributed to such action."

Treasury Regulation § 301.7623-2(a)(2) defines "administrative action" to mean "all or a portion of an [IRS] civil or criminal proceeding against any person that may result in collected proceeds, . . . including, for example, an examination, a collection proceeding, a status determination proceeding, or a criminal investigation."

Treasury Regulation § 301.7623-2(b)(1) provides that "the IRS proceeds based on information provided by a whistleblower when the information provided substantially contributes to an [administrative or judicial] action against a person identified by the whistleblower." This is true when the IRS "initiates a new action, expands the scope of an ongoing action, or continues to pursue an ongoing action, that the IRS

**[\*33]** would not have initiated, expanded the scope of, or continued to pursue, but for the information provided." *Id.* On the other hand, the IRS does not "proceed based on" the whistleblower's information when it merely "analyzes the information provided or investigates a matter raised by the information provided." *Id.* Treasury Regulation § 301.7623-2(b)(2) (example 2) provides:

> Information provided to the IRS by a whistleblower, under § 7623 and § 301.7623-1, identifies a taxpayer, describes and documents specific facts relating to the taxpayer's activities, and, based on those facts, alleges that the taxpayer owed additional taxes in Year 1. The IRS proceeds with an examination of the taxpayer for Year 1 based on the information provided by the whistleblower. The IRS discovers that the taxpayer engaged in the same activities in Year 2 and expands the examination to Year 2. In the course of the examination, the IRS obtains, through the issuance of Information Document Requests (IDRs) and summonses, additional facts that are unrelated to the activities described in the information provided by the whistleblower. Based on these additional facts, the IRS expands the scope of the examination of the taxpayer for both Year 1 and Year 2. For purposes of § 7623 and §§ 301.7623-1 through 301.7623-4, the portion of the IRS's examination relating to the activities described and documented in the information provided is an administrative action with which the IRS proceeds based on information provided by the whistleblower because the information provided substantially contributed to the action by causing the expansion of the IRS's examination of Year 1 and Year 2. The portions of the IRS's examination of the taxpayer in both Year 1 and Year 2 relating to the additional facts obtained through the issuance of IDRs and summonses are not actions with which the IRS proceeds based on the information provided by the whistleblower because the information provided did not substantially contribute to the action.

Section 7623(c) defines the term "proceeds" to include "(1) penalties, interest, additions to tax, and additional amounts provided under the internal revenue laws, and (2) any proceeds arising from laws for which the [IRS] is authorized to administer, enforce, or investigate."

[*34]  In *Lissack v. Commissioner*, 157 T.C. 63, 69–70 (2021), *aff'd*, 68 F.4th 1312, 1324, 1327 (D.C. Cir. 2023), we held that under the regulations discussed in the paragraphs above (Treasury Regulation § 301.7623-2(a)(2) (defining "administrative action"), Treasury Regulation § 301.7623-2(b)(1) (defining when the IRS proceeds with an action), and Treasury Regulation § 301.7623-2(b)(2) (example 2)) the portion of an examination that is unrelated to the fact and issue identified by the whistleblower is a separate administrative action.

Petitioner contends that his information caused the employment tax examination and the income tax examination and that he is therefore entitled to a percentage of the proceeds of these examinations. Under petitioner's calculations, the proceeds from these examinations are $19,768,384 (income tax examination) plus $3,853,345.45 (employment tax examination).

We focus first on the employment tax examination.  Only a portion of the employment tax examination was an action with which the IRS proceeded based on the information provided by petitioner.  This was the portion of the employment tax examination related to the transfer of gift certificates to employees.  *See* Treas. Reg. § 301.7623-2(b)(2) (example 2).  The IRS collected $1,772,040.53 as a result of this action.

We next discuss the income tax examination.  Only a portion of the income tax examination was an action with which the IRS proceeded on the basis of information petitioner provided.  This was the portion of the income tax examination related to the transfer of gift certificates to employees.  *See* Treas. Reg. § 301.7623-2(b)(2) (example 2).  The IRS collected $1,720,582.33 as a result of this action.

The WBO did not abuse its discretion in determining the amount of the proceeds to be multiplied by the award percentage.

II.  *The WBO did not err in determining that the appropriate award percentage was 15%.*

Treasury Regulation § 301.7623-4(c) sets forth rules for the WBO to use to select the award percentage from within the range of 15% to 30%.  The regulation directs the WBO to start the analysis at 15%. *Id.* subpara. (1)(ii).  The WBO is then to "analyze the administrative claim file using the factors listed in [Treasury Regulation § 301.7623-4(b)(1)] to determine whether the whistleblower merits an increased

[*35] award percentage of 22 percent or 30 percent . . . based on the presence and significance of positive factors." *Id.*

The WBO is then to "analyze the contents of the administrative claim file using the factors listed in [Treasury Regulation § 301.7623-4(b)(2)] to determine whether the whistleblower merits a decreased award percentage of 15 percent, 18 percent, 22 percent, or 26 percent . . . based on the presence and significance of negative factors." *Id.*

The regulations provide that, even though the factors listed in Treasury Regulation § 301.7623-4(b)(1) and (2) are described as positive and negative factors, the evaluation of the positive and negative factors cannot be "reduced to a mathematical equation." *Id.* para. (c)(1)(ii). The factors are "not weighted." *Id.* In a particular case, "one factor may override several others." *Id.*

One of the positive factors, listed in Treasury Regulation § 301.7623-4(b)(1), is whether the "information provided identified connections between transactions, or parties to transactions, that enabled the IRS to understand tax implications that might not otherwise have been understood by the IRS." The WBO found this positive factor to be present. However, petitioner contends that the WBO erred in its consideration of this factor because the WBO also observed that the particular documents petitioner supplied were not used in the employment tax examination. Tracing the origins of this observation is helpful in evaluating the merits of petitioner's contention that making the observation was an error.

The Form 11369 prepared by the employment tax examiner stated that the information provided by petitioner was of limited value:

> The information provided by the whistleblower was used to identify barter as an audit issue for both the income and employment tax examiners. For purposes of the employment tax examination, the documentation included with Form 211 was not utilized. Samples of contracts, customer invoices and gift certificates do not verify whether or not these amounts were included in compensation. The information provided on and with Form 211 assisted the employment tax examiner in the selection of accounts for analysis, i.e. barter usage, but it was not useful for evidentiary purposes since it contained estimates and was outside the audit periods.

[*36] WBO Analyst Mitzel wrote a memorandum to WBO manager Lynne Heinrich stating that petitioner's information was not "specific and responsible information" that "materially assisted in the development or identification of an issue" but was "information that . . . was of value in the determination of tax liabilities." Mitzel gave the following reasons:

> The whistleblower information caused the investigation. The documentation provided by the whistleblower supported the allegation that bartering income was not reported. The documentation did not materially contribute to the employment tax examinations. The employment tax examiner noted that the documentation was not utilized as it did not verify that the items received by [name redacted by Court] were provided to employees or whether the amounts were included in the employees compensation. The Employment tax examiner did use the documentation to identify general ledger accounts for review. The employment tax examiner used the alternative legal position provided by the Whistleblower that payments made to employees are taxable. The Whistleblower did not provide an in depth legal analysis he simply provided the applicable codes sections and his assertion that penalties should be applied.

In her Supplemental Award Recommendation Memorandum, WBO Analyst Homola relied on the Forms 11369 to conclude that the proceeds attributable to petitioner's information consisted of $1,772,040.53 for the employment tax examination and $1,720,582.33 for the income tax examination. The memorandum then discussed the appropriate percentage to be used in computing the award. The memorandum stated that the identified-connections factor was present because the "whistleblower included an alternative position which tied the bartering activities to possible employment tax issues." The memorandum stated that the behavioral-impact factor was also present but that the "positive factors do not rise to the level of increasing the award above 15%."

The Supplemental PARL stated that the recommended award percentage was 15% and that the following factors "contributed to the recommended award percentage:" (1) the identified-connections positive factor, (2) the behavioral-impact positive factor, (3) the delay negative

**[\*37]** factor, (4) the whistleblower-contribution negative factor, and (5) the whistleblower-profit negative factor.

The Detailed Report relied on the Forms 11369 to conclude that the proceeds attributable to petitioner's information consisted of $1,772,040.53 for the employment tax examination and $1,720,582.33 for the income tax examination. The Detailed Report stated that the identified-connections and the behavioral-impact factors were present but that they "did not rise to the level of increasing the award above 15%." With respect to the identified-connections factor, the Detailed Report stated:

> The information provided identified connections between transactions, or parties to transactions, that enable the IRS to understand tax implications that might not otherwise have been understood by the IRS.

> The whistleblower included an alternate position which tied bartering activities to possible employment tax issues. However, the determination of tax was made through the efforts of the employment tax examiner who made the following statement:

> Vol 2 of 4, Bates 000013—"The information provided by the whistleblower was used to identify barter as an audit issue for both the income and employment tax examiners. For purposes of the employment tax examination, **the documentation included with Form 211 was not utilized**. Samples of contracts, customer invoices and gift certificates do not verify whether or not these amounts were included in compensation. The information provided on and with Form 211 **assisted** the employment tax examiner in the selection of accounts for analysis, i.e. barter usage, but it **was not useful for evidentiary purposes** since it contained estimates and was outside the audit periods."

On February 5, 2021, petitioner responded to the Detailed Report. Petitioner contended that the behavioral-impact factor was so significant that it justified an increase in the award percentage above 15%. In addition, the response contended that the Detailed Report erred in failing to consider six positive factors in addition to the two positive factors it said were present.

[*38] The Supplemental Award Recommendation Memorandum contained the following discussion of the identified-connections factor:

Positive Factors

The first two factors listed below were determined by the IRS Whistleblower Office to apply to this case.

Whistleblower Comment

1. The information provided identified connections between transactions, or parties to transactions, that enabled the IRS to understand tax implications that might not otherwise have been understood by the IRS. Treas. Reg. 301.7623-4(b)(1)(i)[(vii)].

Whistleblower Office Response

The Whistleblower provided an alternate position which tied bartering activities to possible employment tax issues. However, the employment tax examiner did not use the information included with the Form 211. The examiner stated "Samples of contracts, customer invoices and gift certificates do not verify whether or not these amounts were included in compensation. The information provided on and with the Form 211 assisted the employment tax examiner in the selection of accounts for analysis, i.e. barter usage, but it was not useful for evidentiary purposes since it contained estimates and was outside the audit periods."

In his response to Motion for Summary Judgment, petitioner contends that the WBO erred in its consideration of the identified-connections factor:

Respondent recognizes that this positive factor is both present and significant as reflected with the following statement, "The whistleblower included an alternate position which tied the bartering activities to possible employment tax issues. However, the determination of tax was made through the efforts of the employment tax examiner." Respondent further minimizes this positive factor by quoting the examiner, "The information provided on and with Form 211 assisted the employment tax

[*39] examiner in the selection of accounts for analysis, i.e., barter usage, but it was not useful for evidentiary purposes."

Respondent incorrectly states what he must in order to minimize the award (i.e., award percentage). The whistleblower process is not a court of law. The whistleblower is not required to provide evidence . . . for "evidentiary purposes." This is unnecessary verbiage to simply justify discounting the box checked by the examiner on the Form 11369, giving Petitioner this factor. However, what is clear is that if the whistleblower did not provide information to help the IRS understand the tax implications, nothing would have been collected. Therefore, for the whistleblower office to minimize Petitioner's contribution by relying on the whistleblower office own statement that "the determination of tax would be made through the efforts of the employment tax examiner," is simply nonsensical. The whistleblower cannot determine the tax, nor is he expected to do so. Lastly, stating that the whistleblower's information "was not useful for evidentiary purposes" is again nonsense. An examination is not a court of law, and the whistleblower is not required to provide evidence, but only specific and credible information causing the IRS to take an action. In this case, Petitioner did just that, as well as assist Respondent to understand the tax implications. It is unlikely that any whistleblower provides "evidence" in a whistleblower claim. Therefore, again Respondent simply abused his discretion in the evaluation of this positive factor for purposes of determining (minimizing) award percentage based upon his erroneous assessment of the facts. In the original determination of award, respondent determined a 10% award percentage when the range was between 1% and 15%.

We disagree that the WBO erred. The WBO relied on the employment tax examiner Form 11369 to conclude the documents petitioner supplied were of limited usefulness. The case is distinguishable from an example given in the regulations in which the usefulness of the documents supplied by a whistleblower may justify increasing the award percentage from 15% to 22%:

**[*40]**     *Example (1).* Facts. Whistleblower A, an employee in Corporation's sales department, submitted to the IRS a claim for award under section 7623 and information indicating that Corporation improperly claimed a credit in tax year 2006. Whistleblower A's information consisted of numerous non-privileged documents relevant to Corporation's eligibility for the credit. Whistleblower A's original submission also included an analysis of the documents, as well as information about meetings in which the claim for credit was discussed. When interviewed by the IRS, Whistleblower A clarified ambiguities in the original submission, answered questions about Corporation's business and accounting practices, and identified potential sources to corroborate the information.

Some of the documents provided by Whistleblower A were not included in Corporation's general record-keeping system and their existence may not have been easily uncovered through normal IRS examination procedures. Corporation initially denied the facts revealed in the information provided by Whistleblower A, which were essential to establishing the impropriety of the claim for credit. IRS examination of Corporation's return confirmed that the credit was improperly claimed by Corporation in tax year 2006, as alleged by Whistleblower A. Corporation agreed to the ensuing assessments of tax and interest and paid the liabilities in full.

Analysis. In this case, Whistleblower A provided specific and credible information that formed the basis for action by the IRS. Whistleblower A provided information that was difficult to detect, provided useful assistance to the IRS, and helped the IRS sustain the assessment. Based on the presence and significance of these positive factors, viewed against all the specific facts relevant to Corporation's 2006 tax year, the Whistleblower Office could increase the award percentage to 22 percent of collected proceeds. If, however, Whistleblower A's claim reflected negative factors, for example Whistleblower A violated instructions provided by the IRS and the violation caused the IRS to expend additional resources, then the Whistleblower Office could, based on this negative factor, reduce the award percentage to 18 or 15 percent (but not to lower than 15 percent of collected proceeds).

**[\*41]** Treas. Reg. § 301.7623-4(c)(1)(iii) (example 1).

We conclude that the WBO did not abuse its discretion in its consideration of this positive factor.

Another positive factor in Treasury Regulation § 301.7623-4(b)(1) is whether the "information provided had an impact on the behavior of the taxpayer, for example by causing the taxpayer to promptly correct a previously-reported improper position." With respect to petitioner's whistleblower claim, the WBO found this positive factor to be present. Specifically, the Supplemental Award Recommendation Memorandum stated:

> This information provided had an impact on the behavior of the Taxpayer, for example by causing the Taxpayer to promptly correct a previously reported improper position. The income tax examiner reported that by TYE 3/31/11 the Taxpayer had corrected the barter expense activities that were the focus of the examination. The examiner did not disclose if this was due to the Whistleblower, however, it is more likely than not, this action was due to the examination which was started because of information provided by the Whistleblower.

Petitioner contends that the WBO erred in applying this positive factor. Petitioner's contention is as follows:

> It is very significant that the taxpayer behavior ended when the issue was identified and examined by Respondent. However, rather than giving Petitioner credit, Respondent's whistleblower office simply states in the administrative file, that it does not know why the taxpayer changed its behavior, so as to minimize the impact of this positive factor.

We disagree with petitioner's contention that the WBO did not give petitioner credit for TAXPAYER1's correction to the barter expense deductions. The WBO deemed this factor to be present, and it stated that petitioner's information caused TAXPAYER1 to correct the prior position. We conclude that the WBO did not abuse its discretion in its consideration of this positive factor.

In assigning error to the WBO's Supplemental Determination Under Section 7623(b), petitioner emphasizes that "Respondent

**[\*42]** attributed to Petitioner two positive factors that Respondent determined were both *present and significant*." To the extent that petitioner is arguing that the presence of the two positive factors required the WBO to increase the award from 15% to 22%, we reject the argument. The mere presence of positive factors does not require that the award percentage be increased above 15%. Where positive factors are present, the regulations do not require an increase of the award percentage; but rather they provide that the WBO "*may* increase the award percentage" to either "22 percent *or* 30 percent," at its discretion. Treas. Reg. § 301.7623-4(c)(1)(ii) (emphasis added); *accord Whistleblower 8391-18W v. Commissioner*, No. 8391-18W, 161 T.C., slip op. at 16 (Oct. 16, 2023) ("Thus, the WBO *may* increase or decrease the award percentage on the basis of the presence and significance of any positive or negative factors." (citing Treas. Reg. § 301.7623-4(c)(1)(ii))); Treas. Reg. § 301.7623-4(c)(1)(iii) (example 1) (providing that the WBO "*could* increase the award percentage to 22 percent" after identifying multiple positive factors (emphasis added)). In conclusion, the mere presence of positive factors did not require the WBO to increase the award percentage above 15%, and the WBO did not abuse its discretion in declining to make such an increase.

A negative factor listed in Treasury Regulation § 301.7623-4(b)(2) is whether the whistleblower "delayed informing the IRS after learning the relevant facts, particularly if the delay adversely affected the IRS's ability to pursue an action or issue." In its Detailed Report, the WBO determined that petitioner delayed in informing respondent after petitioner had learned the relevant facts:

> The whistleblower began working for [TAXPAYER1] in [YEAR] as a sales representative where as a new employee, he received a gift basket containing "gift certificates" as a welcoming present. The whistleblower states he later learned that it was normal practice in his office, as well as others, to sell [SERVICE] in the [PUBLICATION] in exchange for gift certificates. The Whistleblower was terminated by the Taxpayer on [DATE]. It was not until after his termination that he reported [TAXPAYER1's] possible noncompliance. The delay did not affect the IRS's ability to pursue an action, however the delay allowed [TAXPAYER1] to continue these activities for several years longer than if the actions were immediately reported.

**[\*43]** Petitioner contends that the WBO erroneously assumed that he could have filed his whistleblower claim when he first started receiving gift certificates. (He first received gift certificates in the form of a gift basket, which he received at the beginning of his employment.)

We disagree with petitioner that the WBO assumed that petitioner should have reported the tax issue immediately when he first began employment. Rather, the WBO explained that it based its determination on the fact that petitioner did not report the tax underpayments until after he was terminated. He was terminated years after he began work at TAXPAYER1. We hold that the WBO did not abuse its discretion in determining that this negative factor was present.

Another negative factor listed in Treasury Regulation § 301.7623-4(b)(2) is whether the whistleblower "directly or indirectly profited from the underpayment of tax or tax noncompliance identified, but did not plan and initiate the actions that led to the underpayment of tax." In its Supplemental Determination Under Section 7623(b) the WBO concluded that this negative factor was present. In explaining this conclusion, WBO Analyst Homola's Supplemental Award Recommendation Memorandum quoted the following excerpt from the employment tax examiner Form 11369:

> The whistleblower's allegation that employees and managers received gift certificates which were not included in their compensation is correct. When he was employed by [TAXPAYER1], the whistleblower was the recipient of a "gift basket containing numerous 'gift certificates' as a welcoming present" as indicated on Form 211. The corporate income and employment tax examinations revealed that nothing was included in any employee's compensation, including the whistleblower's, for the value of bartered goods and services as well as gift cards and other incentives purchased directly by [TAXPAYER1]. It is unlikely that any employee, including the whistleblower, included the value of these (gifts) in taxable income since they were not included in wages or otherwise reported to them.

The WBO's conclusion about this factor was stated in the Supplemental Award Recommendation Memorandum: "The Whistleblower profited from the underpayment on both his reportable income and his employment tax since he did not pay either tax."

**[\*44]** Petitioner's argument that the WBO misapplied this negative factor consists of two points. First, he says, he did not receive any gift certificates. Second, he says, he reported the value of any gift certificates he received on his federal income tax returns.

Part of petitioner's argument is that he did not receive any gift certificates. But petitioner submitted an affidavit to the WBO admitting that he did use gift certificates.

Furthermore, the administrative record does not support petitioner's suggestion that he reported the value of the gift certificates to the IRS and that he paid income tax on the value. Petitioner was subject to the income tax. I.R.C. § 1. His wages were includible in his income. I.R.C. § 61(a)(1) (providing that gross income includes compensation for services). An employer is obligated to withhold income tax from the employee's wages, I.R.C. § 3402(a), and to report to the employee the amount of his wages on Form W–2, Wage and Tax Statement, I.R.C. § 6051; Treas. Reg. § 31.6051-1(a)(1)(i). For these purposes wages include all remuneration for services performed by an employee, including the cash value of all remuneration paid in a medium other than cash. I.R.C. § 3401(a). Here petitioner contends that, although his employer, TAXPAYER1, made no such withholding for gift certificates and did not report the amount of the gift certificates on his Forms W–2, he nonetheless reported the value of the gift certificates on his own income tax return and paid income tax on the value. But he did not explain this contention to the WBO or provide any information to the WBO showing that the contention would be true. He did not disturb the conclusion by the employment tax examiner that "[i]t is unlikely that any employee, including the whistleblower, included the value of these 'gifts' in taxable income since they were not included in wages or otherwise reported to them." We hold that the WBO did not abuse its discretion in concluding that petitioner did not report and pay tax on the gift certificates he received.

Another negative factor listed in Treasury Regulation § 301.7623-4(b)(2) is whether the whistleblower "contributed to the underpayment of tax or tax noncompliance identified." In its Supplemental Determination Under Section 7623(b), the WBO concluded that this negative factor was present. In support of this conclusion, the WBO relied on the excerpt from the employment examiner Form 11369 we quoted above. The WBO's conclusion was stated in the Supplemental Award Recommendation Memorandum: "[B]y not reporting the value of the items as income he also contributed to the underpayment."

**[*45]** Petitioner argues that the WBO improperly applied this negative factor because he did not work in the tax-reporting function of TAXPAYER1 and therefore did not "participate[] in the tax scheme." This argument misapprehends the determination made by the WBO. The WBO determined that it was petitioner's failure to report the value of the gift certificates as part of his income tax liabilities that implicated him in his employer's underpayment of employment taxes. This conclusion is not an abuse of discretion in the light of the relationship between (1) the income tax liability of an employee and (2) the employment tax obligations of employers. The income tax under section 1 is imposed on an employee. But the employer is required—as an employment tax obligation—to withhold the employee's income tax from wages paid to the employee. I.R.C. §§ 3402(a), 3403. The employee receives a credit against income tax for any amounts of income tax actually withheld from wages. I.R.C. § 31(a)(1). If the employer fails to make the required withholding of income tax from wages, the employee is still liable for the income tax. If the employee pays the income tax, this relieves the employer of its liability for the amount of income tax it should have withheld. I.R.C. § 3402(d). Thus, petitioner's liability for income tax on receiving the gift certificates from TAXPAYER1 was related to TAXPAYER1's liability for wage withholding regarding the gift certificates given to petitioner. TAXPAYER1's failure to withhold the required amount meant that petitioner was on the hook for the amount as part of petitioner's income tax liability. Had petitioner paid the relevant amount, TAXPAYER1 would not have been liable for the amount it failed to withhold. Petitioner did not pay the relevant amount, thus contributing to TAXPAYER1's underpayment of income tax withholding.

In conclusion, we hold that the WBO did not abuse its discretion in its consideration of each of the negative factors that it discussed. And even had the WBO erred in considering one of these negative factors to be present when it should not have, this error would be harmless. After considering the positive factors, and before considering the negative factors, the WBO had determined that the appropriate award percentage was 15%. The WBO did not rely on the negative factors to reduce the award percentage because 15% was already the minimum award percentage. *Cf. Luu v. Commissioner*, T.C. Memo. 2022-126, at *19 (finding WBO relied on positive factors to increase the award from 15% to 22% and then relied on negative factors to reduce the award to 15%), *aff'd per curiam*, No. 23-1149, 2024 WL 959876 (D.C. Cir. Mar. 6, 2024). Thus, even if the WBO had determined that none of the negative factors was present, this determination would not have resulted in an

**[*46]** award percentage higher than the 15% award percentage that it ultimately determined.

Petitioner's final challenge to the 15% award percentage is that the percentage is inconsistent with the WBO's original 2015 decision. Recall that in the original 2015 decision, the WBO determined the amount of the award under section 7623(a), not section 7623(b). The IRM provided that a section 7623(a) award was to be determined by multiplying the proceeds recovered by the following award percentages: (1) 15% for "specific and responsible information that caused the investigation or, in claim files already under audit, materially assisted in the development or identification of an issue or issues and resulted in the recovery, or was a direct factor in the recovery," (2) 10% for "information that caused the investigation or, in claim files already under audit, caused an investigation of an issue or issues, and was of value in the determination of tax liabilities although not specific," and (3) 1% for "information that causes the investigation or investigation of an issue, but had no direct relationship to the determination of tax liabilities." IRM 25.2.2.9.1(2). The original 2015 decision applied the 10% rate to $1,771,911.77 of the proceeds of the employment tax examination and the 1% rate to $2,081,433.67 of the proceeds of the employment tax examination.

Petitioner contends that the original 2015 decision selected an award percentage of 10% from a range of 1% to 15%. Petitioner explains that a 10% award from the range of 1% to 15% is about two thirds above the 1% minimum of the range. Petitioner explains that the award that is about two thirds above the 15% minimum of the range 15-30% is 26%. Petitioner concludes that an award of 26% would be appropriate to maintain "parity" with the original 2015 decision.

We are unconvinced that the 15% percentage award selected by the WBO in its Supplemental Determination Under Section 7623(b) is inconsistent with the 1% and 10% percentage awards used in the original decision of the WBO. The original decision made an award under section 7623(a). The Supplemental Determination Under Section 7623(b) made an award under section 7623(b). The making of awards under section 7623(a) is subject to different statutory and regulatory provisions than the making of awards under section 7623(b).

The predecessor of section 7623(a) was section 7623. Section 7623, like current section 7623(a), gave the IRS discretion to determine how much to pay whistleblowers. In 2006 Congress moved the text of

**[\*47]** section 7623 to section 7623(a), and it enacted new section 7623(b). Tax Relief and Health Care Act of 2006, § 406(a)(1), 120 Stat. at 2958–59. Section 7623(b) mandates an award of 15% to 30% for certain whistleblower information. For section 7623(a) awards, the IRS initially chose to make awards of 1%, 10%, and 15% depending on the circumstances. This choice was memorialized in the IRM provisions quoted earlier. IRM 25.2.2.9.1(2) In 2014 Treasury adopted the regulations that (1) provided that the award percentage should generally be selected from the 15% to 30% range and (2) set forth criteria for determining what award percentage should be selected from that range. T.D. 9687, 2014-36 I.R.B. 486; Treas. Reg. § 301.7623-4(a)(1), (c). The 2014 regulations govern awards under both section 7623(a) and (b). T.D. 9687, 2014-36 I.R.B. at 501. The 2014 regulations apply "to information submitted on or after August 12, 2014, and to claims for awards under section 7623(b) that are open as of August 12, 2014." Treas. Reg. § 301.7623-4(e). Petitioner's information was not "submitted on or after August 12, 2014." Furthermore the WBO initially determined that petitioner's award was to be evaluated only under section 7623(a), which meant that it was not in the group of "claims for awards under section 7623(b) that are open as of August 12, 2014." As a result, the original 2015 decision did not follow the 2014 regulations. Our 2017 Opinion held that the WBO should have used section 7623(b). *Smith*, 148 T.C. at 462–63. As a result, the Supplemental Determination Under Section 7623(b) on remand applied the 2014 regulations.

This effective-date provision explains why the Supplemental Determination Under Section 7623(b) applied standards for determining the award percentage different from those applied in the original decision. That different standards were employed did not evince the WBO's abuse of discretion. Rather the WBO was simply following the 2014 regulatory provisions, provisions that it did not apply in its original decision because it treated the award as governed solely by section 7623(a).

III. *The WBO did not err in determining that petitioner's whistleblower award is subject to the sequestration percentage in effect for the fiscal year that the award is paid.*

The Supplemental Determination Under Section 7623(b) stated that the award of $523,893.43 would be reduced by a sequestration amount that would reflect the sequestration percentage applicable for the year the award would be paid. It is petitioner's position that the

**[\*48]** WBO erred in determining that the award is subject to the sequestration percentage in effect for the fiscal year that the award is paid. In *Lewis*, 154 T.C. at 141, we held that such a determination is not arbitrary or capricious and has a sound basis in law. It is respondent's position that such a determination cannot be reviewed by the Tax Court. But in *Lewis*, 154 T.C. at 136–38, we held we had jurisdiction to review such a determination.

Consistent with *Lewis*, we hold that the WBO did not err in determining that the award amount would be reduced by a sequestration amount that would reflect the sequestration percentage applicable for the year the award would be paid.

IV.  *Conclusion*

The determination of the WBO was not an abuse of discretion, arbitrary or capricious, or otherwise not in accordance with the law.

To reflect the foregoing,

*An appropriate order and decision will be entered.*